United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

TARAY T. MORRIS,

        Petitioner,

  v.

TONY MALFI, Warden,

        Respondent.

_____/

No. C 06-7409 SI

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND ISSUING A CERTIFICATE OF APPEALABILITY**

      Taray Morris, an inmate at California State Prison, Sacramento, filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his 2004 conviction in the Monterey County Superior Court. This matter is now before the Court for consideration of the merits of the petition. For the reasons discussed below, the petition is DENIED. The Court issues a certificate of appealability on petitioner's claims.

**BACKGROUND**

      Petitioner was charged in a two-count first amended complaint filed on April 27, 2004, with possession of a deadly weapon by a prisoner in violation of California Penal Code § 4502, and felony assault with force likely to result in great bodily injury in violation of California Penal Code § 245(a)(1). At the time petitioner was charged in this case, he was incarcerated at Salinas Valley State Prison, serving a term of life without the possibility of parole plus 25 years for first degree murder with special circumstances and attempted second degree robbery, consecutive to a sentence of 95 years to life for

carjacking and other offenses.[1]

## I.       State trial court proceedings

At his first appearance on these charges, petitioner waived the right to counsel and pled guilty. Petitioner also admitted the charged enhancing allegation, infliction of great bodily injury, Cal. Penal Code § 245(a)(1), and the charged prior prison terms, Cal. Penal Code §§ 667.5, 1170.12.

At the hearing, the following exchange took place between the state trial court, petitioner, and the Assistant District Attorney:

[case is called]

COURT:                    Taray Morris. Did you sign your *Faretta* waiver as well?[2]

DEFENDANT:          They haven't given me one.

CLERK:                    I asked him earlier if he wanted to represent himself.

COURT:                    Do you want to represent yourself or have an attorney?

DEFENDANT:          I can.

COURT:                    If you want to represent yourself, then I need to give you a *Faretta* form. That's a form that lets you know about representing yourself. If you want an attorney, I can appoint one.

DEFENDANT:          I just want to get it over with.

COURT:                    Well, I can't just get it over with, because it's a certain situation. I know you indicated you are serving quite a bit of time now, but that's up to you. If you want an attorney, we can appoint you one free of charge. They can let you know what's going on in your case. We can set an appointment for him to talk to you.

DEFENDANT:          It would be right now?

COURT:                    I can appoint an attorney to represent you right now, but that person will not have time, because there's so many people right now, to sit down and talk with you privately.

DEFENDANT:          That's the D.A. right there.

---

[1]  These convictions are discussed *infra*.

[2]  This the beginning of the reporter's transcript of the April 27, 2004 hearing.

2

| | | |
|---|---|---|
| 1 | COURT: | Anything you say can and will be used against you. If you talk to that person, whatever you say to him, he's going to use that against you. |
| 2 | | |
| 3 | DEFENDANT: | I want to know if they got a deal for me. What's the deal? |
| 4 | A.D.A. STORMS: | Right now he's looking at 25 to life. |
| 5 | COURT: | Basically 25 to life. That would be consecutive to whatever. |
| 6 | DEFENDANT: | All right. Just give it to me. I got 199 years and two lives. Just give it to me so I can get sentenced, please. |
| 7 | | |
| 8 | COURT: | You're saying you wish to enter a plea of guilty? |
| | DEFENDANT: | Yes. |
| 9 | | |
| 10 | COURT: | He's saying the penalty with having the number of strikes that you have, you'll just do the 25 to life and dismiss Count 2 or 1. |
| 11 | ADA STORMS: | Right.  He could plead to either count. |
| 12 | COURT: | Just Count 1 with the strike conviction? |
| 13 | ADA STORMS: | The 654 would eliminate one of the counts. |
| 14 | COURT: | So Count 1 is sufficient? |
| 15 | ADA STORMS: | Sure. |
| 16 | COURT: | And the only enhancement would be the strike? |
| 17 | ADA STORMS: | Yes, Your Honor. |
| 18 | COURT: | Basically it will be 25 to life consecutive. You want to do that today? |
| 19 | | |
| 20 | THE DEFENDANT: | I can be sentenced? |
| 21 | COURT: | Yes. Go ahead and fill out the Waiver of Rights form. Read it over, initial on the side that you've read those things, and sign on the back. I'll give you a couple of minutes to do that. |
| 22 | | |
| 23 | DEFENDANT: | All right. |
| | (Recess) | |
| 24 | | |
| 25 | . . . . | |
| 26 | COURT: | I got – I'm trying to figure out what's happening here. On this form where it says "my true full name is," I'm not understanding what that says right there. |
| 27 | | |
| 28 | | |

3

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

| | | |
|---|---|---|
| 1 | DEFENDANT: | Your Honor, you don't understand the writing? |
| 2 | COURT: | Correct. Did you put your name or sign your name? |
| 3 | DEFENDANT: | No. That's just gang writing. You can't understand it. |
| 4 | COURT: | Then we need to understand what it says. |
| 5 | DEFENDANT: | That's how I write. |
| 6 | COURT: | I'll go ahead and fill it in. And then it says you're pleading to the charges and don't understand what that says? |
| 7 | | |
| 8 | DEFENDANT: | It says "25 to life." |
| 9 | COURT: | Where you put "N.O," are those your initials or why did you put N.O."?  You just didn't understand the rights? |
| 10 | DEFENDANT: | I understand everything. I just want to plead guilty. |
| 11 | COURT: | Let me go over the form with you, because I can't let you plead guilty unless I know you understand the form. |
| 12 | | |
| 13 | DEFENDANT: | All right. |
| 14 | COURT: | Your true name is Taray Morris? |
| 15 | DEFENDANT: | Taray Morris. |
| 16 | COURT: | It says that you understand that you're pleading guilty to Count 1.  That's a violation of Penal Code Section 4502A.  It alleges that on the 18th of December of 2003 that you did willfully and unlawfully possess a sharp instrument, a weapon, while being confined in the Salinas Valley State Prison.  And the sharp instrument was – was it a shank? |
| 17 | | |
| 18 | | |
| 19 | ADA STORMS: | Yes.  It was a stabbing weapon. |
| 20 | COURT: | A stabbing weapon, that you were in possession of a stabbing weapon while in state prison.  That's Count 1.  You understand that you're entering a plea to that charge? |
| 21 | | |
| 22 | DEFENDANT: | Yes. |
| 23 | COURT: | Also it says that "I'm admitting the following enhancements." You understand that the enhancements you're admitting are that you suffered prior serious felony convictions, so it would be admitting that on the 10th of April 2001 you were convicted in Los Angeles County of a 187, murder.  You are admitting that that is true? |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | DEFENDANT: | That that happened, that I was – |
| 28 | | |

4

1   COURT:            You're admitting that you were convicted of that charge?

2   DEFENDANT:        Yes, ma'am.

3   COURT:            You're also admitting that you do have a prior conviction for an
4                     attempted robbery, and that occurred also on the 10th of April of
                      2001?

5   DEFENDANT:        Yes, ma'am.

6   COURT:            And then also you are admitting a robbery also occurring out of
7                     Los Angeles County, and that would be on the 2nd of December
                      of 1994, when you were convicted of the robbery and also with
8                     use of a firearm.  You're admitting all of those convictions are
                      true; is that correct?

9   DEFENDANT:        Yes.

10  COURT:            So if you're admitting, if you understand that – your initials are
11                    T.M.  Once I read these, you put your initials, you understand the
                      maximum you could receive is 25 to life.

12  DEFENDANT:        Yes, ma'am.

13  COURT:            And then you also understand that you have an absolute right to
14                    have a public and speedy trial, that you can either have a court
                      trial or a jury trial?

15  DEFENDANT:        Yes.

16  COURT:            And that if you enter a plea of not guilty, you will not have a jury
17                    trial or a court trial?

    DEFENDANT:        I understand.
18

19  COURT:            You also understand that you do have the right to be represented
                      by an attorney at all stages of the proceedings, and if you could
20                    not afford an attorney, the Court would appoint one to assist you,
                      free of charge.  Do you understand?

21  DEFENDANT:        Yes.

22  COURT:            And you do not wish to have an attorney represent you?

23  DEFENDANT:        No, ma'am.

24  COURT:            And then also you do understand that you do have the right to
25                    confront the witnesses against you; you have the right to see
                      them, hear them and ask them any questions, and if you wish to
26                    be represented by an attorney, that you could have your attorney
                      ask questions as well?  Do you understand that?

27

28                                              5

| | |
|---|---|
| DEFENDANT: | Yes, ma'am. |
| COURT: | Also, you do understand that you do have the right to have the court compel witnesses to attend court on your behalf, and you also have the right to present evidence on your behalf; do you understand that as well? |
| DEFENDANT: | Yes. |
| COURT: | If you enter a plea of guilty, witnesses will not be coming to court and also you will not have the chance to present any evidence; do you understand that? |
| DEFENDANT: | Yes. |
| COURT: | You also understand that you have the right against self-incrimination. That means you have the right to remain silent or say nothing. Do you understand? |
| DEFENDANT: | Yes, ma'am. |
| COURT: | Also, you could receive fines up to $10,000. And Item Number 7 doesn't apply, that you are entering this plea "pro per." That means by yourself. You give up your right to be represented by an attorney. Do you understand? |
| DEFENDANT: | Yes, ma'am. |
| COURT: | Then also on the back of the form it alleges that you understand that – actually, this is a no probation case, so Item 8 does not apply, but it's just saying the court approval is not binding, but you would be receiving the maximum penalty in any event. |
| | And Number 9, it says you understand that if you enter a plea of guilty or no contest, you are doing that freely and voluntarily and on your own accord, with all the understandings of what has been read to you, and that's what you're doing? |
| DEFENDANT: | Yes, ma'am. |
| COURT: | And also by signing this and putting your initials, that means you understand that you're giving up all your rights that are outlined and that you wish to enter a plea of guilty because you're guilty; is that correct? |
| DEFENDANT: | Yes, ma'am. |
| COURT: | So what we'll do is on these lines here, since you've understood everything, just put your initials along here on this side. Put your initial[s], which [are] T.M., along this side here on the back, and just sign your name Taray Morris, because it's asking for your |

6

**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

|  |  |
|--|--|
| | legal name.  Don't know what your name is inside the prison, but we need your true name here. |
| DEFENDANT: | Yes, ma'am.<br>My name is spelled T-A-R-A-Y. |
| COURT: | We'll correct that.  T-A-R-A-Y.<br>So you've put your initials on the right to everything that was read to you, as well as you signed on the back, so that means you wish to waive all your rights and enter a plea of guilty to being in possession of a deadly weapon or instrument while confined in state prison, correct? |
| DEFENDANT: | Yes. |
| COURT: | You also wish to waive these rights? |
| DEFENDANT: | Yes. |
| COURT: | You understood everything that was read to you? |
| DEFENDANT: | Yes, ma'am. |
| COURT: | And you understood all the admonitions and warnings that were read to you? |
| DEFENDANT: | Yes. |
| COURT: | The maximum penalty is 25 years to life.  You understand that as well? |
| DEFENDANT: | Yes, ma'am. |
| COURT: | You wish to still enter a plea of guilty? |
| DEFENDANT: | Yes, ma'am. |
| COURT: | And also let's go over the dates again to make sure for the record.  The conviction out of Los Angeles for the 187 was on the 10th of April of 2001.  You admit that that's true, you were convicted on that date and time?  April 10th of 2001 you were convicted? |
| DEFENDANT: | I wasn't – I was in jail in '99. |
| COURT: | Do you know when you were convicted of the murder charge in Los Angeles? |
| DEFENDANT: | Yeah. |
| COURT: | In April of 2001 or – |
| DEFENDANT: | I don't know. |

7

Case 3:06-cv-07409-SI   Document 49   Filed 06/29/10   Page 8 of 29

United States District Court
For the Northern District of California

| | | |
|---|---|---|
| COURT: | | Also, the attempted robbery, you were convicted of that out of Los Angeles County as well? |
| DEFENDANT: | | Yes, ma'am. |
| COURT: | | And then as well the robbery out of Los Angeles County with the use of [a] firearm; you admit that as well? |
| DEFENDANT: | | Yes, ma'am. |
| COURT: | | And let's see.  So the factual basis is that – what did you have in your possession at the time?  What kind of instrument was it? What kind of weapon was it that you had in your possession when they searched you back in December?  Do you know what you had? |
| DEFENDANT: | | Just right now? |
| COURT: | | On this one, yeah, the December. |
| DEFENDANT: | | On this case? |
| COURT: | | Yeah. |
| DEFENDANT: | | The shank. |
| COURT: | | The Court will accept the plea. I know you don't understand why I'm being nitpicky. I'm just making sure you understand everything that we put down, because we've [sic] the court reporter that's right there, so she's writing everything down that we're saying, and I'm just setting for the record that you make sure that you understand what it is. I'm not making light of it. It's just that we understand what we are talking about. |
| DEFENDANT: | | All right. |
| COURT: | | The Court will accept your plea.  Do you want to be sentenced? |
| DEFENDANT: | | Yes, ma'am, please. |

Petitioner's Ex. 1, ¶ 2-13.  Petitioner was sentenced to 25 years to life, and did not file a direct appeal of the conviction.

## II.    Petitioner's background

The parties have submitted extensive evidence regarding petitioner's background, most of which was not before the state trial court at the time of the April 27, 2004 hearing.

8

**A.     Criminal history**

**1.     2001 murder conviction**

In *People v. Morris*, 2002 WL 471334 (Cal. App. 2 Dist. Mar. 28, 2002), petitioner was convicted of first degree murder during an attempted robbery and attempted second degree robbery, with findings that he personally used a firearm, and personally and intentionally discharged a firearm causing death and great bodily injury.  The crimes occurred on October 14, 1999, and the trial took place in 2001.  Petitioner was sentenced to life without the possibility of parole, plus 25 years to life.  According to the appellate decision, petitioner accosted the victim while the victim was talking on a public telephone.  Petitioner shot the victim and went through the victim's pockets, stepped away from the victim, then returned and shot the victim three more times in the chest.  *Id*. at *1.  Petitioner presented mistaken  identity and alibi defenses.

On appeal, petitioner raised claims of prosecutorial misconduct and instructional error.  Petitioner also claimed that his sentence constituted cruel and unusual punishment.  Petitioner did not raise any claims about mental incompetence.  However, during the penalty phase of the trial, petitioner presented evidence that over his lifetime he had received several head injuries, including two injuries to the frontal part of the brain "that controls emotions and impulses and inhibition of behavior."  *Id*. at *6.  The Court of Appeal rejected all of petitioner's contentions and affirmed the judgment.

On June 10, 2003, petitioner filed a petition for writ of habeas corpus in the United States District Court for the Central District of California, challenging his convictions for murder and attempted robbery.  *Morris v. Lamarque*, CV 03-4093-GHK.  Petitioner raised four claims: (1) prosecutorial misconduct, (2) instructional error, (3) the sentence constituted cruel and unusual punishment, and (4) ineffective assistance of counsel.  Petitioner did not claim insanity or mental incompetence.  The district court denied the petition.  Respondent's Ex. 21.

On May 5, 2006, petitioner filed a habeas petition in the California Supreme Court attacking the murder conviction on the grounds that petitioner was suffering from paranoid schizophrenia and that auditory hallucinations controlled his actions in committing the homicide.  On November 15, 2006, the

California Supreme Court denied the petition.[3]

### 2.    2001 carjacking conviction

In *People v. Morris*, 2002 WL 454289 (Cal. App. 2 Dist. Mar. 26, 2002), petitioner was convicted of carjacking, possession of a firearm, evading an officer and auto theft.  The crimes occurred on November 2, 1999, and the trial took place in 2001.  Pursuant to California's Three Strikes Law, petitioner was sentenced to a state prison term of 95 years to life.

According to the appellate decision, the victim testified that she was putting groceries in the trunk of her car when a masked man with a gun approached her.  The man told her to "start the car," and after she complied, he told her to get out of the car.  She got out, and he drove off.  Fifty minutes later, a sheriff deputy saw petitioner commit a traffic violation while driving the victim's car.  Petitioner sped away at a high rate of speed and eventually crashed.  The deputy and his partner pulled petitioner from the car and found a gun and mask inside.  "Morris told the police 'The reason I was in the car was for the money.'  He said he got the gun 'from my little home boys,' and the mask from 'Knott's Scary Farm.'  He carjacked Harwood because his 'homies' wanted a BMW.  He said, I'm guilty as fucked, I already know that.'"  *Id.* at *1.  On appeal, petitioner raised claims of prosecutorial misconduct and instructional error, and did not raise any claims about mental incompetence.  The Court of Appeal rejected petitioner's claims and affirmed the judgment.

In addition to these convictions, petitioner has earlier convictions for robbery and assault with a firearm, as well as a juvenile record of sustained petitions for receiving stolen property, vandalism, auto theft, attempted robbery and robbery.  *See People v. Morris*, 2002 WL 471334, at *5-6.

### B.    Medical/psychiatric history

#### 1.    Pre-2005

Petitioner claims that he has suffered visual and auditory hallucinations since childhood.  In

---

[3]  The record in this case does not contain the Supreme Court's decision.

10

United States District Court
For the Northern District of California

support of this claim, he has submitted the declaration of his mother, Francine Allen.  Petitioner's Ex.

12.  Ms. Allen states, *inter alia*, that petitioner began to "show bizarre behavior and impaired thinking

at about age seven," when he "began to talk to me about hearing people tell him about devils and

demons."  *Id.* ¶¶ 2, 4.  Ms. Allen also states that she began taking petitioner to weekly sessions with a

psychologist at the August Hawkins Mental Health Center, which was part of the Los Angeles

County/U.S.C. Medical Center.  *Id.* ¶ 4.[4]  Respondent notes, however, that medical records dating from

when petitioner was treated in 1999 for a brain trauma (discussed *infra*) report that "the mother states

that the patient has never had seizures or any other problems, psychiatric problems, or headaches."

Petitioner's Ex. 13 at 2.

Ms. Allen also states that her family has a history of paranoid schizophrenia, and that petitioner

has suffered three traumatic head injuries.  Allen Decl. ¶¶ 6-10.  The first injury occurred in 1981 when

petitioner was five years old and was knocked unconscious in a car accident with his mother.  *Id.* ¶ 8.

The second injury occurred when petitioner was 13 years old and was shot in the head.  *Id.* ¶ 9.  Ms.

Allen states that the bullet is still in petitioner's head, although in 1994 petitioner told the Los Angeles

County Probation Department that when he was shot in the head the bullet "did not penetrate his skull."

Respondent's Ex. 11 at 9.  That same Probation Department report states that petitioner "relates he can

function normally."  *Id.*  The third injury occurred on February 18, 1999, at age 22, when petitioner was

hit by a car, beaten on his head and face, and run over.  Petitioner's Ex. 13.  Petitioner was diagnosed

with numerous injuries, including traumatic brain injury.  *Id.* at 000043-44.  Petitioner spent three weeks

in the hospital, was discharged to a medical center, and finally discharged into the care of his mother

in April 1999.  *Id.* at 000074.

Respondent has submitted the declaration of Dr. Ralph David Wheeler.[5]  Dr. Wheeler is a

psychologist for the California Department of Corrections, Sacramento (CSP Sacramento).  Wheeler

---

[4]  Petitioner states that "the existence of records from this treatment facility has not yet been confirmed."  Amended Petition at 13:10-11.

[5]  Petitioner's motion to strike paragraph 10 of Dr. Wheeler's declaration is addressed *infra*.

United States District Court
For the Northern District of California

Decl. ¶ 2 (Docket No. 25, Ex. 12). Dr. Wheeler is also the program director of CCCMS (Correctional Clinical Case Management System for inmates in the general population and in administrative segregation). *Id.* ¶ 3. Dr. Wheeler explains that CCCMS is an outpatient program for inmates who have received a mental health diagnosis but are able to function well enough in the general population. *Id.* ¶ 4. Dr. Wheeler reviewed petitioner's prison file for the years 1997-2006. *Id.* ¶ 5. Dr. Wheeler states that at the time that petitioner arrived at CSP Sacramento "he was a general population inmate and was not in the Mental Health Delivery System at any level." *Id.*

In reviewing petitioner's medical file, Dr. Wheeler located four institution progress notes relating to mental health screening between 1998 and 2004. The earliest is dated February 26, 1998. Wheeler Decl. Ex. 4. It states that petitioner was "alert and focused. He denied experiencing any auditory or visual hallucinations," and that petitioner "does not appear to meet the criteria for inclusion in the Mental Health Services Delivery System." *Id.* The next progress note is dated December 24, 2003. It states that petitioner expressed no current mental health problems and was not experiencing hallucinations, delusions or suicidal ideation. *Id.* Ex. 3. It also states petitioner's mood was "euthymic," or normal. *Id.* The third progress note is dated September 29, 2004. *Id.* Ex. 1. It states that petitioner "denies any serious psych. complaints," denies any suicidal or homicidal ideation, and assesses petitioner's current mental status as "clear, some attitude, but generally compliant." *Id.* The fourth progress note is dated November 17, 2004. *Id.* Ex. 2. This note also states that petitioner "denies any serious psych. complaints," denies any suicidal or homicidal ideation, and describes petitioner's current mental status as "clear." *Id.*

### 2.    2005 diagnosis and involuntary medication

Prison psychiatric records indicate that on February 10, 2005, after petitioner transferred to CSP Sacramento, he was referred to the psychiatric staff based on auditory hallucinations and paranoid ideation. Petitioner's Ex. 14 at 1. On March 17, 2005, petitioner was diagnosed with head injury psychosis and/or chronic paranoid schizophrenia by psychiatrists at CSP Sacramento. *Id.* at 6. At that

United States District Court
For the Northern District of California

12

**United States District Court**
For the Northern District of California

time, prison psychiatrist Dr. Maghaddas prescribed a combination of anti-psychotics and mood stabilizer medication. *Id.* Dr. Maghaddas's treating notes for March 17, 2005 state, *inter alia*, that petitioner "recently been hearing" and "has felt they are out to get me." *Id.* Dr. Maghaddas noted that petitioner "has not informed MH professional till lately." *Id.*

On May 28, 2005, petitioner was placed in the prison's Enhanced Outpatient Program ("EOP") level of care, which provides services to inmates with serious mental disorders. *Id.* at 13. Various reports from May 2005 through August 2005 note that petitioner had auditory hallucinations and delusions about spirits traveling into bodies of random people and threatening to kill petitioner. *Id.* at 13, 14, 31, 42, 46. One report states that petitioner reported that a demon or being has been trying to kill him throughout his life. *Id.* at 13. In November 2005, petitioner was returned to CCCMS. Wheeler Decl. ¶ 7.

Prison psychiatrists eventually deemed it necessary to forcibly administer psychotropic medications to petitioner, and petitioner was first involuntarily medicated on February 17, 2006. Petitioner's Ex. 15 at 1. On March 21, 2006, prison officials filed the first petition for involuntary medication pursuant to *Keyhea v. Rushen*, 178 Cal. App. 3d 526 (1986). *Id.* at 7. On March 29, 2006, prison officials obtained judicial authorization to involuntarily medicate petitioner with psychotropic medications for paranoid schizophrenia, based on a finding that petitioner was a danger to himself. *Id.* at 19. According to petitioner, since that time the prison has renewed its request for permission to involuntarily medicate petitioner every six months. Amended Petition at 16:1-2.

The initial *Keyhea* petition describes petitioner's paranoid delusions and hallucinations as follows:

> [T]he consistent theme of Mr. Morris' psychotic symptoms has been devils and evil spirits that give him instructions through command auditory hallucinations. Petitioner reported witnessing devils or evil spirits jumping in and out of people's bodies. He could see and hear these demons and he felt the need to follow their instructions. Furthermore, he thought that the demons were attempting to kill him, and he stated that he believed his only option to stop them was to kill himself. He admitted that if he were given the opportunity to kill himself, he would do so. Petitioner also disclosed that the demons told him not to take his medications.

*Id.* at 12.

13

### 3. 2009 evaluation and report by Dr. Natasha Khazanov

Dr. Natasha Khazanov is a clinical psychologist.  At the request of petitioner's habeas counsel, Dr. Khazanov conducted a two-part inquiry and evaluation of petitioner.  Dr. Khazanov reviewed and evaluated psychological and medical records pertaining to petitioner's head traumas, criminal cases, and family medical and psychiatric history.  Dr. Khazanov also conducted neuropsychological testing on petitioner.  Dr. Khazanov summarizes her professional opinion as follows:

> [A]fter thoroughly reviewing all of the material that was provided to me by Mr. Morris's habeas counsel, and after conducting a full battery of neuropsychological and intelligence tests on July 24 and 25, 2009, it is my professional opinion that: (1) Mr. Morris suffered a severe brain injury causing permanent brain damage on February 18, 1999, and possibly also suffered brain damage at the age of 5 during a car accident which rendered him unconscious; (2) that Mr. Morris suffered severe cognitive deficits and impairments at the time of my examination in August 2009, including problems with information processing, the inability for rational understanding of the legal proceedings and the nature and reason for constitutional rights that he waived, and the inability to appreciate the nature and consequences of his actions, and the inability to conform his behavior to the social norms; (3) that Mr. Morris shows signs of genetic predisposition to chronic psychopathology (i.e., chronic, psychotic mental illness), specifically paranoid schizophrenia characterized by hallucinations and delusions; and (4) that repeated brain injuries, as well as chronic psychopathology, are likely responsible for Mr. Morris's cognitive deficits and impairments.  It is also my professional opinion that Mr. Morris also suffered from these cognitive deficits historically, at least as early as his release from treatment for the February 1999 brain trauma, as well as in October of 1999 when he allegedly committed a murder during an attempted robbery and a car-jacking on a separate occasion, on December 18, 2003 when he allegedly possessed a dangerous weapon while in prison, and on April 27, 2004, when he entered a plea to the weapon charge without legal representation.

Khazanov Decl. ¶ 11.

### C. Other evidence

Petitioner received his high school equivalency certificate in 1997, and received high and passing cognitive test scores in 2001 and 2003.  Respondent's Ex. 13-15.

In January 2004, petitioner incurred a prison disciplinary violation.  *Id.* Ex. 16.  The report on the violation states, *inter alia*, that "Inmate Morris stated his health was good," and that "Inmate Morris also read the CDC-115 out loud clearly and concisely indicating to this SHO that he was indeed capable

14

*United States District Court*
For the Northern District of California

of comprehending all of his due process rights and the ramifications of the charges." *Id.* at 2.

In March 2004, petitioner incurred another prison rules violation. *Id.* Ex. 17. The disciplinary hearing on the March 2004 violation occurred on April 20, 2004, one week before petitioner's April 27, 2004 hearing and guilty plea. The report on the hearing states,

> Morris's TABE Reading score is unknown. Therefore, to ascertain if Morris is able to read and understand the contents of the RVR and associated documents, this SHO asked Morris if he could read and write in English, and understands what he reads. Morris stated that he could read, write, and understand English. Morris then demonstrated to this SHO by reading this RVR, and acknowledged he understood the contents and the charges. This SHO then instructed Morris to explain the contents of the RVR and associated documents in his own version of what he understood. Without reading or looking at the materials, Morris stated to this SHO that he was being charged with overfamiliarity with staff. In addition, Morris stated that he had a GED. This SHO was satisfied with Morris's demonstration, therefore a Staff Assistant was not deemed necessary.

*Id.* at 2.

On June 12, 2004, petitioner was interviewed by a prison investigator regarding a complaint that petitioner had filed against several prison staff members. *Id.* Ex. 18. Petitioner informed the investigator that he had submitted the complaint because he had heard from other inmates that the staff members in question were telling other inmates that petitioner might be targeted for retaliation due to petitioner assaulting another inmate of another race. *Id.* The report states, "Inmate Morris said several inmates advised him to file a staff complaint against the staff just in case something happen to him after he was released from AdSeg. Inmate Morris told me the inmates that gave him the advise [sic] said the quickest way to get a transfer from Salinas Valley State Prison was to file a complaint against staff claiming his life was endanger [sic]. Inmate Morris also said on the advice of his homeboy he wrote a letter to his family in Compton, California and told them to come to the institution and file a complaint in person to help support his claim of staff misconduct." *Id.* The report also states, *inter alia*, "I asked Inmate Morris if he felt his life was endanger [sic] and he stated, 'No, it's just when my homeboy from the streets tell me that staff said something regarding me, I believe it.' Morris said he wanted to voluntary [sic] withdraw the First Level Appeal, Log# SVP-D-04-01761 because he didn't want to make allegations that staff said he was going to be beat up or stuck by another race." *Id.*

**III.    State habeas proceedings in this case**

On October 17, 2005 petitioner, filed a *pro se*[6] habeas petition in Monterey County Superior Court, claiming that his due process rights were violated because he was tried and adjudicated in April 2004 on the weapons charge while mentally incompetent, that he was denied his constitutional right to counsel, that he was denied his constitutional right to a jury trial, and that he was denied his constitutional right to a jury determination of guilt beyond a reasonable doubt as to every element of the crimes charged against him.  In a decision filed November 28, 2005, the Superior Court denied the petition.  The court held that a review of petitioner's criminal file showed that he waived his right to counsel and pled guilty.  Respondent's Ex. 4.  The court also held that petitioner's claim that he was incompetent should have been raised on direct appeal, and noted that petitioner had not filed a direct appeal.

Petitioner then filed habeas petitions in the California Court of Appeal and the California Supreme Court, raising the same issues of mental incompetence, and denial of right to counsel and jury trial.  The California Court of Appeal and the California Supreme Court denied the petitions in summary denial orders.

**STANDARD OF REVIEW**

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

---

[6] Petitioner was assisted by a fellow inmate.

United States District Court
For the Northern District of California

Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decision[] but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

In reviewing a habeas corpus petition, a federal court must look to the last reasoned decision of the state court to determine whether the court's decision was contrary to or an unreasonable application of established federal law. *Luna v. Cambra*, 306 F.3d 954, 960-61 (9th Cir. 2002). Here, the last reasoned decision of the state court is the decision issued by the Superior Court.

## DISCUSSION

Petitioner raises three interrelated claims in his petition for writ of habeas corpus. First, petitioner claims that he was denied substantive due process because he was tried, adjudicated and sentenced while he was mentally incompetent. Second, petitioner claims that he was denied his right to counsel in violation of the Sixth and Fourteenth Amendments. Third, petitioner claims he was denied his right to a jury trial in violation of the Sixth and Fourteenth Amendments; this claim is not an independent claim for relief, but is instead the consequence of a guilty plea. A guilty plea, if valid, includes a waiver of the right to a jury trial, so the question is whether the guilty plea is valid. The gravamen of all of petitioner's claims is that when petitioner waived his right to counsel and pled guilty to the charged crimes, he was mentally incompetent and lacked the capacity to understand the nature

17

1    of the proceedings.

2

3    **I.      Failure to hold competency hearing**

4           A criminal defendant may not be tried unless he is competent and he may not waive his right to

5    counsel or plead guilty unless he does so competently and intelligently. *Godinez v. Moran*, 509 U.S.

6    389, 396 (1993).   The conviction of a defendant while legally incompetent violates due process.

7    *Cacoperdo v. Demosthenes*, 37 F.3d 504, 510 (9th Cir. 1994).

8           Due process requires a trial court to order a psychiatric evaluation or conduct a competency

9    hearing *sua sponte* if the court has a good faith doubt concerning the defendant's competence.  *Pate v.

10   Robinson*, 383 U.S. 375, 385 (1966); *Cacoperdo*, 37 F.3d at 510.   This standard is "clearly established

11   Federal law, as determined by the Supreme Court" within the meaning of 28 U.S.C. § 2254(d)(1).

12   *Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000) (citing *Pate*, 383 U.S. at 385).

13          A good faith doubt about a defendant's competence arises only if there is substantial evidence

14   of incompetence.  *Cacoperdo*, 37 F.3d at 510; *see also Miles v. Stainer*, 108 F.3d 1109, 1112 (9th Cir.

15   1997) (competency hearing is required whenever evidence before court "raises a reasonable doubt

16   whether defendant is competent").   Several factors are relevant to determining whether a hearing is

17   necessary, including evidence of a defendant's irrational behavior, his demeanor at trial, and any prior

18   medical opinion on competence to stand trial.  *United States v. Loyola-Dominguez*, 125 F.3d 1315, 1318

19   (9th Cir. 1997).  Even one of these factors standing alone may, in some circumstances, be sufficient to

20   create a reasonable doubt regarding the defendant's competence.  *Id.* at 1319 (due process required a

21   hearing to ascertain whether defendant was competent to stand trial where he attempted suicide on eve

22   of trial).  Courts have generally found sufficient evidence of incompetence in lengthy histories of acute

23   psychosis and psychiatric treatment, *see, e.g., Moore v. United States*, 464 F.2d 663, 665 (9th Cir. 1972)

24   (defendant repeatedly hospitalized for acute mental illness and hallucinations), or extremely erratic and

25   irrational behavior during the course of the trial, *see, e.g., Tillery v. Eyman*, 492 F.2d 1056, 1057-58 (9th

26   Cir. 1974) (defendant screamed throughout nights, laughed at jury, made gestures at bailiff, disrobed

27

28
18

United States District Court
For the Northern District of California

in courtroom and butted his head through glass window).  A lack of attentiveness before the trial judge is not enough to create a good faith doubt about a defendant's competence, however.  *Williams v. Woodford*, 384 F.3d 567, 606 (9th Cir. 2004).

"In reviewing whether a state trial judge should have conducted a competency hearing, we may consider only the evidence that was before the trial judge."  *McMurtrey v. Ryan*, 539 F.3d 1112, 1119 (9th Cir. 2008); *Amaya-Ruiz v. Stewart*, 121 F. 3d 486, 489 (9th Cir. 1997); *United States v. Lewis*, 991 F.2d 524, 527 (9th Cir. 1993).  Under California law, a criminal defendant's mental state is presumed competent unless it can be proven by a preponderance of the evidence that he is mentally incompetent. Cal. Penal Code 1369(f); *see also Medina v. California*, 505 U.S. 437, 449 (1992) (California's statute providing for presumption of competency and requiring that party asserting incompetency has the burden of proof does not violate due process).

Petitioner argues that the trial court should have inquired about petitioner's mental competence based on several "bizarre" or otherwise inappropriate responses that he made during the colloquy between the court and petitioner.  Petitioner argues that his statement that he wanted to consult a lawyer only if the lawyer could speak to him "right now" was an irrational rejection of the offer of appointed counsel.  Similarly, petitioner argues that when he was offered the "deal" of a life sentence, petitioner's response of "Alright, just give it to me.  I got 199 years and two lives.  Just give it to me so I can get sentenced please," demonstrated that he misunderstood the impact of a life sentence, even on a person already serving a life term.[7]  Relatedly, petitioner argues that his statement that he just wanted to "get it over with" was irrational.

Petitioner also argues that when he filled out the change of plea form and wrote his name as "N.O." and told judge "that's just gang writing. You can't understand it . . . That's how I write," this was an "inappropriate comment" to the judge's questions.  In addition, petitioner notes that he could not remember the date of his murder conviction (2001), and he asserts that his response to the judge's

---

[7]  Aside from asserting that petitioner misunderstood the impact of a life sentence, counsel does not elaborate on the impact of this sentence, in light of the fact that petitioner is serving a sentence of life without the possibility of parole, plus 25 years, consecutive to a sentence of 95 years to life.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

question about the date of the conviction (telling the judge that he was "in jail in 1999") evidenced a lack of understanding of the significance of trial and conviction.  Finally, petitioner asserts that his inability to complete the plea form himself should have alerted the trial judge that further inquiry was necessary to determine petitioner's competence.

Petitioner has not shown that a competency hearing should have been held in this case. Petitioner himself concedes that his statements and behavior at the hearing did not show paranoia or delusional thinking, but asserts that "neither does it constitute evidence that petitioner was competent at that time."  Traverse at 6.  However, the standard that this Court must apply is whether the evidence before the trial court raised a reasonable doubt as to whether petitioner was competent.  It is undisputed that at the time of April 27, 2004 hearing, petitioner was not receiving any psychiatric treatment and he had not been diagnosed with any psychiatric conditions.[8]  There is no indication that petitioner's competence had ever been questioned in any of the prior criminal proceedings.  The transcript shows that petitioner understood the judge's questions and understood the legal proceedings.  Petitioner corrected the judge's spelling of his name, Petitioner's Ex. 1 (April 27, 2004 transcript at 10:9-10), and indicated that he knew a Deputy District Attorney was present in court and stated, in reference to the D.A., "I want to know if they got a deal for me.  What's the deal?"  *Id*. at 3:5-11.  After admitting a prior conviction of robbery with the use of a firearm, the judge asked petitioner about  what kind of weapon he was charged with possessing.  Petitioner asked for clarification: "Just right now? . . . On this case?"  *Id*. at 12:6-8.  After the judge answered in the affirmative, petitioner stated, "The shank."  *Id*. at 12:10.

Petitioner's stated desire to plead guilty and get through the proceedings quickly is not necessarily evidence of mental illness, and could just as easily be explained by the apparent irrelevancy of imposing an additional life sentence on an individual who is already serving a life sentence without the possibility of parole, plus 25 years, in addition to a sentence of 95 years to life.  *Id*. at 3:16-18

---

[8] Although petitioner's mother states that petitioner went to weekly sessions with a psychologist when he was a child, Ms. Allen does not state that petitioner received a diagnosis of any type. Petitioner does not assert that there was any evidence or indication to the state trial court that petitioner had any previous psychiatric treatment.

(petitioner stating, "All right.  Just give it to me.  I got 199 years and two lives.  Just give it to me so I can get sentenced, please.").  Similarly, there is nothing obviously irrational about forgoing appointed counsel because of the delay associated with that process, particularly in light of petitioner's lengthy criminal history and experience with the criminal justice system, and the sentences he was serving at the time.

Although petitioner's comment about his "gang writing" was inappropriate, that comment does not, without more, suggest that petitioner was mentally incompetent.  When the judge questioned him about what "N.O." meant on the "Waiver of Rights: Plea of Guilty/No Contest" form, petitioner responded that it was "just gang writing.  You can't understand it."  The judge then asked petitioner "And then it says you're pleading to the charges and don't understand what that says." and petitioner responded, "It says "25 to life," indicating that he understood the judge's question.  *Id.* at 5:13-15; *see also* Petitioner's Ex. 2 ("Waiver of Rights: Plea of Guilty/No Contest" form).  The judge followed up, "Where you put 'N.O.,' are those your initials or why did you put the 'N.O.'?  You just didn't understand the rights?"  Petitioner responded, "I understand everything.  I just want to plead guilty."  *Id.* at 5:16-20.

Similarly, the fact that petitioner could not remember the date of his murder conviction, and his response that he was in jail in 1999 (on the murder charge), do not ineluctably lead to the conclusion that petitioner did not understand the significance of trial and conviction.  The judge questioned him several times about his prior convictions, and his responses indicated that he understood the questions.  *See id.* at 6:14-7:11.  As noted *supra*, petitioner has a lengthy criminal history, and between 1999 and 2001 was tried in two different cases on numerous charges; the fact that he could not remember when he was convicted on the murder charge, and his response that he was in jail in 1999, could simply reflect the fact that petitioner has had numerous convictions and temporally overlapping criminal prosecutions.  In addition, the fact that the judge completed part of the form for petitioner does not mean that petitioner was unable to fill out the form, or indicate that the judge had reason to believe an inquiry into mental competency was necessary.  Rather, the judge completed part of the form after petitioner stated that the

"gang writing" was "how I write." *Id.* at 5:7-11.  After the judge stated, "I'll go ahead and fill it in" the judge also stated, "Let me go over the form with you, because I can't let you plead guilty unless I know you do understand the form," showing that the court sought to ensure that petitioner understood the form.

This record, devoid of any details of questionable behavior, stands in stark contrast to the evidence in other cases that was found to be enough to demonstrate the need for a competency inquiry. *See Cacoperdo*, 37 F.3d at 510 (denial of motion for psychiatric evaluation did not render trial fundamentally unfair where petitioner made single conclusory allegation he suffered from mental illness); *Steinsvik v. Vinzant*, 640 F.2d 949, 952-53 (9th Cir. 1981) (denying writ where petitioner stated he was "a little confused," lawyer told trial judge petitioner was involved in out-patient psychiatric counseling, and presentence report revealed hospitalization in neuro-psychiatric ward, out-patient treatment, and diagnosis as borderline chronic paranoid schizophrenic); *cf. Odle v. Woodford*, 238 F.3d 1084, 1087-89 (9th Cir. 2001) (granting writ due to failure to conduct competency hearing, where reasonable jurist would have had good faith doubt of defendant's competency in light of a history of massive lobectomy, followed by severe personality change and series of psychiatric hospitalizations; a suicide attempt while in jail awaiting trial; and expert testimony describing defendant's extensive brain damage); *Loyola-Dominguez*, 125 F.3d at 1318 (due process required a hearing to ascertain whether defendant was competent to stand trial where he attempted suicide on eve of trial).

## II.    Petitioner's competence

"In a habeas proceeding, a petitioner is entitled to an evidentiary hearing on the issue of competency to stand trial if he presents sufficient facts to create a real and substantial doubt as to his competency, even if those facts were not presented to the trial court." *Deere v. Woodford*, 339 F.3d 1084, 1086 (9th Cir. 2003) (quoting *Boag v. Raines*, 769 F.2d 1341, 1343 (9th Cir. 1985)).  A "good faith" or "substantial doubt" exists "when there is substantial evidence of incompetence." *Cuffle v. Goldsmith*, 906 F.2d 385, 392 (9th Cir. 1990).  A defendant's competence to represent himself for

purposes of pleading guilty turns on whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding – whether he has a rational as well as factual understanding of the proceedings against him." *Boag*, 769 F.2d at 1343 (citing *Dusky v. United States*, 362 U.S. 402, 402 (1960), and *Chavez v. United States*, 656 F.2d 512, 518 (9th Cir. 1981)). Evidence of mental impairment or mental illness which does not meet the standard set forth in *Dusky* is insufficient to show mental incompetence. *See Atkins v. Virginia*, 536 U.S. 304, 318 (2003) ("Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial"); *United States v. Timbana*, 222 F.3d 688, 701 (9th Cir. 2000) (defendant competent despite cognitive impairment from brain damage).

Petitioner contends that evidence not available to the trial court shows that petitioner was mentally incompetent at the time of his plea. Petitioner argues that the diagnosis by prison officials in March 2005 that he suffered from chronic paranoid schizophrenia and his subsequent need to be involuntarily medicated show that he was mentally incompetent at the time of the April 2004 hearing. Additionally, petitioner asserts that the assessment by Dr. Khazanov in July and August of 2009 shows that he was mentally incompetent at the time of his plea in 2004. Dr. Natasha Khazanov found that petitioner "had problems with information processing" and was unable to have "rational understandings of the legal proceedings and the nature and reason for constitutional rights that he waived, and the inability to appreciate the nature and consequences of his actions, and the inability to conform his behavior to the social norms." Khazanov Decl ¶ 11. Dr. Khazanov also found that petitioner had a "predisposition" for "paranoid schizophrenia characterized by hallucinations and delusions," and that repeated brain injuries resulted in "cognitive defects and impairments." *Id*. As part of this 2009 assessment, petitioner took a neurological test where his score indicated petitioner was mentally retarded – scoring in the bottom 5th to 8th percentile. Petitioner contends these tests further demonstrate "severe impairment of memory, judgment, insight, and other cognitive functions needed to understand legal proceedings and meaningfully assist counsel." *Id*. ¶¶ 44-66.

Although it is a close call, the Court finds that petitioner has not raised a real and substantial doubt that he was incompetent at the time of the April 2004 hearing. The fact that petitioner was diagnosed with chronic paranoid schizophrenia in March 2005, and involuntarily medicated beginning in 2006, does not mean that he suffered from that condition, or that he was mentally incompetent, in April 2004. At the time of the April 2004 hearing, petitioner had been in prison for several years, and indeed prior to the 2002 murder and carjacking convictions, petitioner had been in and out of prison several times, yet petitioner had not been in the prison mental delivery system at any level until February 2005. The Court finds it particularly significant that two mental health screenings were conducted on petitioner after the April 2004 hearing, in September and November of 2004, and that the notes for both screenings state that petitioner "denies any serious psych. complaints" and denies any suicidal or homicidal ideation, and both screenings assess petitioner's current mental status as "clear." Wheeler Decl. Ex. 1, 2. In addition, on April 20, 2004, one week before petitioner's guilty plea in this case, petitioner had a disciplinary hearing on a prison rules violation. During that hearing, petitioner stated that his health "was all-right," and he demonstrated that he could read and comprehend the charges such that it was deemed that he did not meet the criteria for a Staff Assistant to help him with the charges. Respondent's Ex. 17. Similarly, the report of the June 12, 2004 interview with petitioner regarding the complaint that he filed against prison staff shows that petitioner understood what was going on; he explained to the interviewer why he had filed the complaint, including the information that he had contacted his family and asked them to substantiate the complaint, as well as the information he had been given by fellow inmates that filing a complaint was the "quickest way" to get an institutional transfer. *Id*. Ex. 18. Petitioner demonstrated rational thought by stating that he wished to retract the complaint because he had not actually heard the staff tell him personally that he was going to be beat up. *Id*.

Similarly, the new evidence produced as a result of Dr. Khazanov's 2009 assessment does not create substantial doubt as to whether petitioner was incompetent at the time of the 2004 proceeding. "Although a trial court may consider a defendant's history of mental illness, it must 'properly focus[ ]

United States District Court
For the Northern District of California

its inquiry [on the defendant's] mental state at the time of the [proceedings].'" *United States v. Legget*, 162 F.3d 237, 244 (9th Cir. 1998) (citations omitted) (quoting *United States v. Morgano*, 39 F.3d 1358, 1374 (7th Cir. 1994)). Dr. Khazanov's testing shows that petitioner currently has significant cognitive deficits, while prison psychologists found that petitioner had high cognitive test scores in June 2001 and passing scores in February 2003. Respondent's Ex. 14-15.[9] While the objective evidence shows that petitioner was suffering from serious mental illness as early as February 2005 when he was referred to prison psychiatric staff, there are no medical records showing that petitioner was mentally ill prior to February 2005, and to the contrary, the September and November 2004 mental health screenings assessed petitioner's mental health status as "clear." In addition, as discussed *supra*, petitioner did not engage in any erratic or irrational behavior at the April 27, 2004 hearing. *See Boag*, 769 F.2d at 1343 (petitioner did not create real and substantial doubt about competence where, *inter alia*, evidence of 5 suicide attempts between 1954 and 1965 "occurred long before" 1967 trial and petitioner failed to show that head injuries and alcoholism caused any mental impairment at the time of trial); *cf. Zapata v. Estelle*, 588 F.2d 1017, 1022 (5th Cir. 1979) (finding real and substantial question about competence where doctor testified at trial that petitioner suffered from severe emotional problems and was hallucinatory, and a psychiatrist examined her days after trial and found her legally insane based on a condition that "contra-indicates sudden onset.").

### III.    Waiver of counsel and entering guilty plea

Petitioner also contends that his rights were violated when he waived his right to counsel and entered the guilty plea because he was incompetent, and thus his waivers of counsel and his right to a jury trial were not knowing and voluntary. These contentions are largely premised on the contention

---

[9] The "Recommendation for Adaptive Support" forms contain boxes for the psychologist to check. The 2001 form contains a checked box next to the statement, "Inmate has high cognitive test scores and did not require adaptive functioning evaluation." Ex. 14. The 2003 form is phrased differently, and instead of a statement about "high cognitive test scores," contains a statement (that was checked), "Received passing score on cognitive test. No further evaluation needed without referral." Ex. 15.

that petitioner was incompetent at the time of the April 27, 2004 hearing; for the reasons discussed *supra*, the Court finds that there was no reason for the state trial court to question petitioner's competence, and petitioner has not created substantial doubt as to whether he was incompetent at the time of his plea.

However, a finding that a defendant is competent is not all that is necessary before he may be permitted to waive his right to counsel. In addition to determining that a defendant who seeks to waive counsel is competent, a trial court must satisfy itself that the waiver of his constitutional rights is knowing and voluntary. *Godinez*, 509 U.S. at 400 (citations omitted). Similarly, entering a guilty plea also requires both the defendant's competence and a determination that the plea was knowing and voluntary. *Godinez*, 509 U.S. at 400. Whereas competency involves a defendant's general ability to understand the proceedings against him, "[t]he purpose of the 'knowing and voluntary' inquiry, by contrast, is to determine whether the defendant actually *does* understand the significance and consequences of a particular decision and whether the decision is uncoerced." *Id.* at 401 n.12 (emphasis in original).

To determine whether a defendant actually understands the nature and consequences of a request to waive counsel, the court must abide by the principles set forth in *Faretta v. California*, 422 U.S. 806, 835 (1975). *Edwards,* 128 S. Ct. at 2385; *Godinez*, 509 U.S. at 400-402. Under *Faretta*, the defendant must "be aware of the nature of the charges against him, the possible penalties, and the dangers and disadvantages of self-representation." *United States v. Balough*, 820 F.2d 1485, 1487 (9th Cir. 1987). "The constitutional requirement is satisfied when the trial court informs the accused of the nature of the charges against him, of his right to be counseled regarding his plea, and of the range of allowable punishments attendant upon the entry of a guilty plea." *Iowa v. Tovar*, 541 U.S. 77, 81 (2004). The information a defendant must possess in order to make an intelligent election will thus depend on a range of case-specific factors, including the defendant's education or sophistication, the complex or easily grasped nature of the charge, and the stage of the proceedings. *Id.* at 88.

1    Similarly, to determine whether a defendant's guilty plea is "a voluntary and intelligent choice

2    among the alternative courses of action," *North Carolina v. Alford*, 400 U.S. 25, 31 (1970), a trial court

3    must follow the guidelines set forth in *Boykin v. Alabama*, 395 U.S. 238, 242-43 (1969). *Godinez*, 509

4    U.S. at 401 n.12.   Under *Boykin*, the record of the plea proceeding must reflect that the defendant

5    voluntarily waived his right to a jury trial, the right to confront his accusers, and his privilege against

6    self-incrimination. *See Parke v. Raley*, 506 U.S. 20, 28-29 (1992).

7    Here, the transcript shows that the state trial judge informed petitioner of the nature of the

8    charges against him, his right to an appointed attorney, and the range of possible punishment as required

9    by *Tovar*, as well as his right to a jury trial, the right to confront accusers, and his privilege of self-

10   incrimination, as required by *Boykin*.   The voluntariness of petitioner's waiver is demonstrated by the

11   fact that petitioner repeatedly stated that he did not want an attorney to represent him, that he wished

12   to represent himself and enter a plea, and that he "understood everything."   The transcript also shows

13   that petitioner demonstrated an understanding of the proceedings.   While petitioner's guilty plea without

14   a "deal" may appear irrational in isolation, the fact that he was already serving two life sentences,

15   including one without the possibility of parole, provides a reasonable basis to assume petitioner

16   understood the consequences of his plea.   *See Tovar*, 541 U.S. at 93 (given particular facts and

17   circumstances surrounding case, trial court's admonition to defendant who entered uncounseled guilty

18   plea was constitutionally sufficient where court informed defendant of the nature of the charges against

19   him, of his right to be counseled regarding his plea, and of the range of allowable punishments attendant

20   upon entry of a guilty plea).

21   Petitioner also argues that because he was not represented by counsel, there was no effort made

22   to strike his prior convictions for sentencing purposes.   Petitioner relies on *People v. Superior Court*

23   *(Romero)*, 13 Cal. 4th 497 (1997), which addressed the scope of a state trial court's discretion to strike

24   prior convictions pursuant to Cal. Penal Code § 1385(a) when sentencing defendants under California's

25   Three Strikes Law.   As relevant here, § 1385(a) provides that upon a motion by the prosecuting attorney,

26   or on the court's own motion, the trial court may strike a defendant's prior convictions when to do so

27

28

is "in furtherance of justice." *Id*.; Cal. Penal Code § 1385(a). *Romero* held that a court's discretion to strike prior convictions "in furtherance of justice" is "limited," and "requires consideration both of the constitutional rights of the defendant, and the interests of society represented by the People, in determining whether there should be a dismissal. At the very least, the reason for dismissal must be 'that which would motivate a reasonable judge.'" *Id*. at 530-31 (internal citations omitted).

The Court finds it extremely unlikely that any trial court would have considered striking petitioner's prior convictions under § 1385(a). At the time of the April 2004 hearing, petitioner had an extensive criminal history, and was serving sentence of life imprisonment without the possibility of parole for first degree murder with special circumstances, consecutive to a sentence of 95 years to life for carjacking, possession of a firearm, evading an officer, and other convictions. Petitioner was charged with, and pled guilty to, possession of a deadly weapon in prison and assault with a deadly weapon on another inmate with the infliction of great bodily injury. Under these circumstances, it would not appear to be "in furtherance of justice" for the trial court to have stricken petitioner's prior convictions.

## IV.    Petitioner's motion to strike

Petitioner has filed a motion to strike paragraph 10 of the Declaration of Dr. Wheeler. Respondent did not file a response to the motion to strike. The paragraph that petitioner seeks to strike is the following:

> I have not personally evaluated or treated inmate Morris, so I cannot offer an opinion as to his mental health. However, I thought it was unusual that Morris appears to have shown no signs of mental health issues and that no mental health issues were apparent to clinical staff until he arrived at CSP Sacramento. Also, I should note that in my experience as the director of the CCCMS program, I am aware that some inmates fake or exaggerate symptoms in order to be transferred into EOP [Enhanced Outpatient Program] because in many respects it is an easier, less stressful, way to do time. Because it can be safer, some inmates will seek a transfer to EOP to get away from an enemy. In addition, some inmates seek the transfer because they believe those in EOP are easier to prey upon. Due to my lack of clinical contact with inmate Morris, I cannot say whether these factors were actually present or influenced his behavior, only that they play a role in some inmates seeking removal from general population housing.

Wheeler Decl. ¶ 10.

Petitioner contends that this paragraph should be stricken because Dr. Wheeler offers expert opinions and observations that do not satisfy Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceutical*, 509 U.S. 579 (1993). Petitioner argues that because Dr. Wheeler has never examined petitioner, Dr. Wheeler lacks any personal knowledge from which to form any reliable opinions about petitioner's mental health. The Court agrees, and notes that Dr. Wheeler expressly states that he is not forming any opinions about petitioner's mental health. Petitioner also contends that Dr. Wheeler's observations about other unspecified inmates' actions and motives have no bearing on petitioner's competence at any time. The Court agrees, and finds that Dr. Wheeler's opinions as set forth in paragraph 10 do not "assist the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702, and accordingly this paragraph is STRICKEN.

## V.    Certificate of Appealability

Pursuant to Rule 11 of the Rules Governing Habeas Corpus Cases Under Section 2254, the Court has reviewed the record in this case and issues a certificate of appealability on petitioner's claims.

## CONCLUSION

For the foregoing reasons and for good cause shown, the petition for writ of habeas corpus is hereby DENIED. The Court finds no need for an evidentiary hearing on this matter. The Court also GRANTS petitioner's motion to strike paragraph 10 of the Wheeler Declaration. (Docket No. 47). Finally, the Court issues certificate of appealability of petitioner's claims.

**IT IS SO ORDERED.**

Dated: June 29, 2010

SUSAN ILLSTON
United States District Judge

*United States District Court*
*For the Northern District of California*